### BAIN et al. v. WHITE et al.

(Circuit Court of Appeals, Fifth Circuit. February 27, 1919.)

No. 3170.

1. APPEAL AND ERROR ☞1008(2)—REVIEW—FINDINGS OF COURT.

　　Where jury was waived and all matters submitted to the judge, his findings on issues of fact are, at least, entitled to as much consideration as a verdict, and so will not be disturbed on appeal, if there was evidence furnishing a basis therefor.

2. CONTRACTS ☞280(5) — DRILLING WELL — PERFORMANCE — "GOOD CLEAN HOLE."

　　Conclusion that contract to drill oil well which, when completed to depth of 2,000 feet, shall be a "good clean hole," had not been carried out, is warranted; it appearing that a piece of piping had been left in such condition that either withdrawal of the pipe stem or mere lapse of a short time resulted in the hole being obstructed by the pipe; a "good clean hole" being one free from those things, presence of which would render it incapable of the uses for which it was designed.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. CONTRACTS ⊙⇒221(3)—DRILLING WELL—DEMONSTRATING PERFORMANCE.
   Contract for drilling oil well, price to be paid only on the sinking of a good clean hole to the depth of 2.000 feet, impliedly requires demonstration to owner of depth and character of well before he is to accept and pay for it.

4. CONTRACTS ⊙⇒64—CONSIDERATION.
   If agreement, after contractor had claimed to have completed drilling of oil well, to postpone measurement and delivery, was a new contract requiring consideration, the then advancing by owner to contractor of money for pay roll was an implied consideration.

5. CONTRACTS ⊙⇒280(5)—DRILLING WELL—PERFORMANCE.
   Refusal to permit contractor for drilling oil well to use, for purpose of overcoming a cave-in, a size of pipe which will reduce the size of hole contracted for, is justified.

6. CONTRACTS ⊙⇒322(3)—DRILLING WELL—PREVENTION OF PERFORMANCE—EVIDENCE.
   Evidence in action by contractor for drilling oil well held to warrant finding that failure of well to be a good clean hole was not due to any failure of owner to furnish necessary piping, as agreed.

7. CONTRACTS ⊙⇒220—DRILLING WELL—OPTION OF CONTRACTOR—DUTY AS TO FURNISHING PIPING.
   Contract for drilling oil well, providing for owner furnishing piping, for commencement of work within a reasonable time, and for no payment, except on the sinking to a depth of 2,000 feet of a well with a good clean hole, and giving contractor option to deepen a hole commenced by another, or drill a new well, did not require owner, on failure of contractor, after deepening the old hole, to get the required well, to furnish additional piping for drilling another well.

8. TRIAL ⊙⇒388(1)—REFUSAL TO FIND—CONSTRUCTION OF JUDGE'S STATEMENT.
   Statement or holding of judge, on the evidence submitted, that the facts were too indefinitely developed to authorize a judgment, was not a refusal to make a finding on the evidence, but amounted to no more than that plaintiffs, seeking damages on the theory that they were entitled to recover contract price for drilling oil well, less cost of drilling, had failed to establish that cost.

In Error to the District Court of the United States for the Southern District of Texas; Waller T. Burns, Judge.

Action by Robert Bain and another against J. P. White and another. Judgment was adverse to plaintiffs, and they bring error. Affirmed.

L. A. Carlton, of Houston, Tex., for plaintiffs in error.

Charles R. Brice and Wm. A. Dunn, both of Roswell, N. M., and Sam Streetman, of Houston, Tex., for defendants in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

BATTS, Circuit Judge. A contract between White, of one part, and Bain and Knott of the other, provided for the drilling by the latter of a well in Hockley county, Tex. The parts of the contract having bearing upon the present controversy are:

Section 3, which provides that the well should be sunk to a depth of 2,000 feet, unless a flow of oil, gas, or water is secured before that depth is reached; section 5, which recites that J. M. Mook & Son had undertaken to drill a well that had not been carried to completion, and provides that Bain and Knott might use this hole, if they thought

proper; section 6, providing for the compensation, and that, if the drillers fail to sink the well to a depth of 2,000 feet, they should be held to have breached the contract and entitled to no compensation; section 7, providing that the work should be done in a good and workmanlike manner; section 8, with a provision to this effect, "It is a further condition and undertaking of the parties of the second part that the well, when completed to a depth of 2,000 feet, shall be a good clean hole"; section 9, providing that White "agreed to furnish and deliver at site of well all piping, with drive shoes for bottom of pipes necessary for completion of the well."

The questions necessary for determination were: (1) Was the well when completed to a depth of 2,000 feet, a good clean hole? (2) If there was a failure to deliver a "good clean hole" 2,000 feet deep, was this the result of White's failure to furnish necessary piping? (3) Assuming the failure of the first well, did the drillers have a right to drill another, the piping to be furnished by White, and did the refusal of White to furnish additional piping, whereby the drilling of another hole was prevented, result in loss and damage to the drillers?

[1] The questions do not come to this court as matters for primary determination, but involve a consideration of whether there was evidence from which the conclusions of fact forming the basis of the judgment could have been drawn. Under a stipulation by the parties, the jury was waived, and all matters at controversy submitted to the trial judge. The extent to which, under such circumstances, the finding of the District Judge is conclusive, is the subject of discussion in the briefs of the parties. This, at least, may be said of the applicable law: The findings of the trial judge upon issues of fact submitted to him are entitled to as much consideration as the verdict of a jury. The case is disposed of upon the assumption that they are not entitled to greater consideration. Applying the rule applicable to verdicts of the jury, the question as to each of the issues suggested would be whether there was evidence furnishing a basis for the conclusion reached.

Even if the testimony of all the witnesses tendered by defendant be eliminated, it would be possible, under the rule announced, to sustain the finding of the court. All of the evidence which was introduced to show that the plaintiff was at any time in a position to deliver "a good clean hole" 2,000 feet deep is that of the plaintiff Bain and his employé, Philip Cezeaux. Both of these witnesses unequivocally testified that on the 18th of December, 1914, the contractors had ready for delivery to White "a good clean hole" 2,000 feet deep. If they had not testified further, and if no other evidence had been introduced, the statements would doubtless have required a judgment for plaintiffs. The effect, however, of the testimony of both witnesses, is, in large measure, destroyed by their subsequent statements. Bain testified (Record, 96):

"About the 12th or 15th, I got a note from the driller, and he wrote me to come out on the 18th, and he would measure the well out to me.

"Q. This pipe was still in there when you went back? A. When I went back when?

"Q. When you went back on the 18th of September? A. They had side-tracked it, then.

"Q. Now, you stated that the condition of the well was such that, to leave it a few hours with the drill stem, this pipe might run over again and obstruct the well? A. Yes.

"Q. That was the condition when Mr. White was there in December? A. Why, I suppose it was. We had pulled the pipe on the 18th, and he was up there on the 20th. We had the hole in good shape on the 18th.

"Q. Well, you could have measured it out to him on the 18th? A. Yes, sir.

"Q. And within an hour or two, or perhaps three or four hours, it would have been in a condition that you couldn't have measured it. A. Well, it might. Then, again, I have known them to stand there for three months, and you go right back to the bottom. This well had a cave in it at the bottom of the 6¼"."

Again he testified (Record, 104):

"Q. Then, when you reported that you were down 2,000 according to the contract, the well at that time was not a good hole on account of this casing, was it? A. It was a good hole, good and clean and down 2,000 feet.

"Q. Well, it was clean, but would you call it a good hole? A. Well, it is a good deal better hole than I drilled in lots of other places."

Again he testified (Record, 104):

"Q. Now, when you claimed to have this contract completed, the condition of the well was such that there was a broken pipe, that had been sidetracked, that was liable to lean over in the well and obstruct it at any time? A. Well, it did do it; yes, sir.

"Q. You found that obstruction in there when you went back in January? A. Yes, sir.

"Q. It might have been in there when Mr. White came over, might it not? A. It might have been, yes, sir; but it wasn't in there—

"Q. Now, when you pulled your drill out and stopped your drilling, it is possible that pipe leaned right back into the hole at that time? A. No, sir; I don't think so. We had pulled it out to put on a new bit.

"Q. You had some trouble with that pipe in there before, had you? A. No, sir.

"Q. The next time you attempted to put your drill stem in, why you found it obstructed with this pipe you had sidetracked? A. After the well had stood for 10 days without any work."

Mr. Bain testified (Record, 81):

"Well, we went on down with the well, and got down 2,000 feet. We had two measurements; one measurement was 1,973 feet, and one measurement was 2,018 feet.

"Q. When was that? A. That was, I think, the 3d day of November.

"Q. Third day of November, 1914? A. 1914. Mr. White sent Mr. Walker out there to receive the well, and I told Mr. Walker I couldn't deliver it to him; that I had twisted some pipe off."

Philip Cezeaux, after having testified (Record, 143 et seq.) that, on the 18th of December, 1914, there was a "good clean hole," ready for delivery, further testified (Record, 151):

"Q. Now, you were speaking about this being a good clean hole. It had a drill bit and stem in it, did it not? A. Yes, sir."

Again (Record 152):

"Q. Were you the driller that broke the drill stem in the hole? A. I broke it off on the 2d or 3d of November."

The statement of plaintiff and one of his employés that, having reached a depth of 2,000 feet or more on the 18th of December, they had a clean open hole at that time, must be taken in connection with the other

statements of the same witnesses, to the effect that, prior to that time, a pipe had been twisted off in the well and had been sidetracked; and in connection with the facts with reference to which they testified as to developments, when an effort was made to resume work.

When Mr. White was at the well on the 20th of December, to measure and receive the well, it was not practicable for the measurements to be made. The drill stem had been pulled up, and it would have been necessary to raise steam and do a number of hours of work before it could have been again forced to the bottom of the well. The only practicable way to measure the well was by measuring the drill stem. It was not practicable to measure it with a cord and weight. The method by which, under the rotary process, a well is drilled, requires the presence in the well of mud, introduced from the top through the drill stem, and this mud is not totally removed until the well is finished and washed out. An ordinary plumb bob could not have penetrated this mud to the bottom, nor could a suspended joint of pipe. On account of the delay which would have been occasioned in getting the drill stem to the bottom, and then taking it out for measurement, it was agreed that the measuring of the well should be postponed until the 1st of January. When an effort was made about that date to prepare the well for measurement, it was found that the piece of pipe which had been sidetracked had fallen into the well. Whether this was the result of the withdrawal of the drill stem, or came from some other cause, does not appear; but it was apparent that, on the 18th of December, the time plaintiff and his employé fixed as a date upon which the well was down to 2,000 feet, with a good, clean hole, the conditions were either that the sidetracked pipe had already fallen back into the hole, or that the hole could be obstructed by the falling back into it of the sidetracked pipe.

[2] The District Judge was warranted in the conclusion that the contract had not been carried out, when it was made to appear that a piece of piping had been left in such condition that either the withdrawal of the drill stem, or the mere lapse of a short period of time, would result in the hole's being obstructed by the pipe. By a good clean hole is not to be understood one which is free from mud, but one which is free from those things, the presence of which would render the hole incapable of the uses for which it was designed. The witness stated that on the 18th of December the hole was a good clean one. He could have known nothing to support such a conclusion, other than that, before the drill stem was withdrawn, it rotated without difficulty, and that it was withdrawn without difficulty. The District Court was not without warrant in rejecting these conclusions of the witnesses, and reaching a conclusion of his own that at that time, when the well was tendered for measurement, the conditions were such that the well did not meet the requirements of the contract.

[3] Plaintiff in error contends that the contract makes no provision for the measurement of the well. It is, perhaps, an implied obligation of almost every contract that the person who undertakes to do something shall, upon the completion of his work, or his claim that the work is completed, make a reasonable showing of the truth of that

claim. It is certainly not ordinarily contemplated that one who has contracted to pay for completed work should pay merely upon the statement of the contractor that the work had been done. This must be the case as to contracts of the kind here under consideration. White was certainly not expected to pay the drillers $19,000 for a clean hole, 2,000 feet deep, without something to evidence that the hole was 2,000 feet deep and that it was clean. He was not compelled to rely upon the statement of the contractor. If these propositions have not been formulated into legal principles, they are, at least, accepted by the business world; and the contractors in this case recognized the obligations they were under to show to the owner that they had carried out the contract. They realized, or at all events understood, that they were to make a delivery to White of a good clean hole, 2,000 feet deep, and that they were to demonstrate to White the depth and character of the hole before he was to accept the well and pay the price.

[4] When, on the 20th of December, it became apparent that it was not practicable to measure the hole on that day, it was agreed between the parties that the measurement and delivery should take place at a future date. If it should be said that this was a new contract, and that there was necessity for a consideration to support it, an implied consideration was furnished by the advancing by White to the contractor on that day of money to pay employés.

At no time thereafter was the contractor in a position to make a delivery of a good clean hole, 2,000 feet deep. When the drill stem was again put down, the obstructing pipe made it impossible for the bottom of the hole to be reached; and, notwithstanding the fact that work continued for some time thereafter, the obstruction was never passed.

[5, 6] A provision of the contract is to the effect that the necessary piping should be furnished by White. The plaintiff contends that, if the well was not finished as a clean good hole, to a depth of 2,000 feet, this was the result of the failure upon the part of White to furnish piping in accordance with the terms of his contract. There is evidence to the effect that there was a cave-in in the well, and one of the witnesses for the plaintiff testified that the caved-in part should have been protected by casing; and he also testifies that it would have been practicable to have cased off the caved-in part, and says that, if it had been done, there would have been no difficulty in completing the well to the depth required by the contract. This could not, however, be done without the use of smaller pipe than 6¼, and the reduction in the size of the hole. White refused to furnish this smaller piping, or to permit the reduction of the hole. He was acting entirely within his rights.

The evidence fails to show that, at any time prior to the time when the contractors assumed the well to have been finished, was there any effort to secure additional casing, other than that wanted for a reduced hole. At all events, if there is evidence which may be so construed, it is in direct conflict with the testimony of White. At no time during the efforts to carry out the contract was all the available piping used. There is evidence that one or more joints twisted in two,

256 F.—28

and there are generalizations to the effect that some of the piping was old and not in good condition. The record, however, fails to show that additional piping was, on this ground, demanded. Or, again, if any part of the evidence may be so construed, it was in conflict with the testimony of White.

While the record shows that there was a cave-in, it does not indicate that the cave-in was the cause of the inability to finish the well. Apparently the difficulty was with pipe which was stuck in shale; and the shale, according to the evidence, was of a firm formation, which did not cave. The cave-in was below the pipe that could not be moved. It is not made to appear that any amount of pipe of the required dimension could have met the difficulty.

There was no suggestion, at the time of the trouble with the stuck pipe, that it resulted from any failure upon White's part to perform his part of the contract. Nor was there any contention, when plaintiff was undertaking to get the well in a condition for delivery, that the trouble could be met if he would do his duty under the contract.

The facts seem to be that, exercising the option which the contract gave them, the contractors concluded to use the old Mook well. This well had been abandoned by Mook because of the impracticability of completing it to 2,000 feet, and the difficulties which the original contractor could not overcome were not successfully met by the new contractors.

While the contractors reached a depth of 2,000 feet, and thereby, to that extent, tested the territory, and by so doing benefited the owner, yet the contract specifically provided that no payment should be made, except upon completion of the well, with a good clean hole. The contract price was a large one. Two-thirds of the distance had already been drilled. If the well could be completed without trouble, the contract would be an exceedingly profitable one. To get the benefit of this chance, the contractors assumed risks that went against them. They are not, under the terms of the contract, entitled to anything, having failed to furnish the only thing for which White agreed to pay.

[7] The contract provided that the contractors could drill a new well, or deepen the Mook hole. When it became apparent that the Mook hole, as deepened by the contractors, would have to be finally abandoned, the contractors proposed to begin an entirely new well. To this White made no objection. The contractors, however, insisted that White should furnish the piping. This he was unwilling to do, except to the extent to which piping was on the ground or could be taken from the old well. Failing to secure any further agreement from White with reference to the piping, the entire contract was abandoned. The contract gave to the contractors the right to use the Mook well, or to make a new location. It gave them the right to the necessary piping for the well, not limited to the piping in the Mook well. They exercised the right to use the Mook well, and they used so much of the piping which had been furnished for the Mook well as they desired. A provision of the contract was that the work should begin within a reasonable time. The suggestion of the starting of a new well did not come until more than 18 months after the signing of the contract. It

would have been entirely within the rights of White to refuse to furnish any piping for, or to permit the location of, a new well. He, however, had no objection to the contractors' continuing their effort to secure the contract price, but did decline to furnish additional piping. In doing this he was entirely within his rights.

[8] The District Judge apparently disposed of this feature of the case upon the assumption that the contractors had the right to put down a new hole, and to demand of White the necessary piping. Acting upon this theory, he permitted the introduction of evidence as to the cost of drilling wells in the territory in which this well was located. The evidence upon this issue was very divergent and conflicting. It was developed that some $17,000 had been expended by Mook on the well, and that plaintiffs had spent approximately $13,000 in trying to complete it; yet plaintiffs testified that they could have put down another well in the same locality to the depth of 2,000 feet for about $6,000. The testimony of persons who had drilled wells in this territory was to the effect that the cost would be more than $20,000.

Upon the evidence submitted the trial judge held that the facts were too indefinitely developed to authorize a judgment. This statement or holding by the judge is criticized as a refusal to make a finding upon the evidence; but, in legal effect, it amounts to no more than that the plaintiffs, seeking damages upon the theory that they were entitled to recover the contract price, less the cost of drilling a well, had failed to establish such cost. White was under obligations to furnish piping for one well, seasonably begun, but not for another, proposed to be started a year and a half after the contract was made. But if the obligation to furnish additional piping had existed, and if White breached the contract, it would be necessary to sustain the holding of the District Judge, as the evidence as to the cost of a well was conflicting.

Upon each of the propositions upon which the plaintiffs have depended, conflicting testimony was introduced, upon which the District Judge found in favor of the defendant. Under the law we would not be authorized to overrule these findings, and the judgment will have to be

Affirmed.